Argued July 7, affirmed August 12, 1953

# STATE OF OREGON *v.* MONK

260 P. 2d 474

*Harrison R. Winston,* of Roseburg, argued the cause for appellant. On the brief were Winston & Dimick, of Roseburg.

*Robert G. Davis,* Special Prosecuting Attorney, of Roseburg, argued the cause for respondent. With him on the brief was Donald S. Kelley, Deputy District Attorney, of Roseburg.

Before LATOURETTE, Chief Justice, and WARNER, ROSSMAN, LUSK, BRAND and PERRY, Justices.

ROSSMAN, J.

This is an appeal by the defendant from a judgment of the circuit court, based upon a verdict, which adjudged him guilty of the crime of embezzlement (§ 23-523, OCLA). The indictment charged that he embezzled $257.25 of the moneys belonging to Patrick Kelly Post of the Veterans of Foreign Wars.

■ This is the second time that the defendant's alleged theft of $257.25 of the moneys of Patrick Kelly Post of the Veterans of Foreign Wars has been before this court. In *State of Oregon v. Monk,* 193 Or 450, 238 P2d 1110, substantially the same facts were before us that are here now. The charge there, like the present one, was embezzlement. The opinion, written by Mr. Justice TOOZE, reversed the judgment of guilt because of error in the instructions given to the jury. Before so doing, it found an irregularity in the indictment, but held that it did not render the indictment void. After the reversal, the facts concerning the defendant's alleged embezzlement were submitted to the grand jury then sitting, evidently for the purpose of securing a corrected indictment, and thereupon the one was returned

upon which the present judgment of guilt is based. Thus, the cause is before us upon a new indictment. The defendant did not plead former jeopardy, as permitted by § 26-841, subd. (3), OCLA. His failure to have done so constituted a waiver of former jeopardy as a defense, if the facts above mentioned have, in fact, subjected him twice to jeopardy. *State v. Houghton,* 45 Or 110, 75 P 887; *Gue v. City of Eugene,* 53 Or 282, 100 P 254; 22 CJS, Criminal Law, § 277, p 412; and 14 Am Jur, Criminal Law, § 280, p 958.

From the facts summarized in our former opinion, it will be noticed that the defendant was the manager of a club in Roseburg known as the Veterans' Lounge which the aforementioned Veterans organization owned, and that on January 9, 1951, the Lounge conducted a smoker for the purpose of obtaining a fund which the Post proposed to send to American hospitals in Japan for the avail of American enlisted men who were wounded in the Korean campaign. According to the state, the fund was to consist of the total receipts of the smoker less only the expenses directly attributive to it. The Post termed the contemplated fund the Korean Fund. The defendant was made manager of the smoker.

The state claims that the total receipts of the smoker, less the night's expenses, were $257.25 and that, although it was the defendant's duty to have delivered that sum to the Post, he never did so, but, on the contrary, converted the money to his own use.

The defendant submits the following assignments of error:

1. "The Court, on examination of witness Leo Young, erred in refusing to permit the introduction

into evidence of defendant's Exhibits 26, 27, 28 and 29.''

2. ''The Court erred in refusing to grant motion of defendant for a directed verdict of acquittal.''

3. ''The Court erred in instructing the jury on the law of reasonable doubt.''

We will now give attention to the first assignment of error. A consideration of it calls for a review of some of the evidence. Since a consideration of the second assignment of error also requires mention of the evidence, we will combine the review as we now proceed.

Exhibits 26, 27, 28 and 29, which are mentioned in the first assignment of error, are not four instruments, but four pages of a single instrument which is entitled ''Statement of Cash, Accountability for the period January 9, 1951, to January 22, 1951''. It was prepared by one Leo F. Young, a certified public accountant whom the defendant had employed for that purpose. The document is a compilation of what purports to have been the receipts and disbursements of the Veterans' Lounge during the period of January 9 through January 22, 1951. In making his compilation, Mr. Young used information gleaned from the following sources: (1) the account book kept by the Lounge; (2) bills and statements of account which came to his hand and which purported to represent sums disbursed by the defendant; (3) oral statements made to him (Young) by the defendant in which the latter mentioned sums which he said he had expended but for which he possessed no written evidence; and (4) the January, 1951, ledger sheet of the Lounge's bank account. Thus the document which the defendant offered and which the challenged ruling rejected covered the period of January 9 through January 22, 1951. It showed re-

ceipts totaling $1,766.72 and expenditures of $1,751.63. Mr. Young's statement terminated with January 22, 1951, possibly because on that day the Lounge terminated the defendant's employment. The defendant contends that if Mr. Young's statement had been received in evidence it would have shown that he (defendant did not convert the Korean fund to his own use.

The first page of Mr. Young's statement is a computation showing receipts and disbursements. The other three pages consist of matter explanatory of the entries upon the first page.

The following is a copy of the first page of Mr. Young's statement:

Statement of Cash Accountability for the Period
January 9, 1951 to January 22, 1951

CASH TO ACCOUNT FOR:

| | | | |
|---|---|---|---|
| Cash on hand at beginning of business January 9, 1951 | | | $ 90.00 |
| Receipts— | | | |
| Sales per cash register tapes | | $1,399.72(1) | |
| Cover charge | | 70.00(2) | |
| Commission on vending machines | | 11.55(3) | |
| Smoker receipts | $257.25 | | |
| Less amount included in sales | 61.80 | 195.45(4) | |
| Total receipts | | | 1,676.72 |
| Total to account for | | | $1,766.72 |

ACCOUNTED FOR AS FOLLOWS:

| | | |
|---|---|---|
| Disbursements— | | |
| Disbursements per books supported by paid bills and receipts | | $ 204.61(5) |

| | | |
|---|---:|---:|
| Special mix | $ | 244.80(6) |
| Orchestra | | 331.00(7) |
| Extra waitress and bartender | | 30.00(8) |
| Other recorded disbursements | | 34.60(9) |
| Unrecorded disbursements— | | |
| Rent paid A. J. Hochradel | $200.00(10) | |
| Kalberer Hotel Supply on account | 60.00(11) | |
| Frederickson's Photo Lab film rental | 50.00(12) | |
| Payment of back wages | 105.00(13) | |
| Payroll advances | 226.00(14) | |
| Other unrecorded disbursements | 12.62(15) | 653.62 |
| Total disbursements | | $1,498.63 |
| Other— | | |
| Cash deposited in checking account on January 18, 1951 | | 165.00 |
| Cash on hand January 22, 1951, turned over to Mr. Cooper | | 88.00 |
| Total accounted for | | $1,751.63 |
| Cash not accounted for | | $ 15.09 |

The numerals enclosed in parentheses refer to corresponding numerals upon the explanatory pages.

The defendant claims that Young's compilation was admissible under the rule which, as stated by § 2-212,

OCLA, (amended by Oregon Laws 1949, Ch 75) reads as follows:

> "There shall be no evidence of the contents of a writing, other than the writing itself, except in the following cases: * * *. 5. When the originals consist of numerous accounts, or other documents, which cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole."

The state claims that the parol and hearsay evidence rules barred receipt of the document.

In order to show that (1) the smoker produced for the Korean fund $257.25, (2) on January 9, 1951, the defendant had custody of the fund, and (3) the defendant later converted the fund to his own use, the state presented the testimony of several witnesses to whom the defendant, a few days after January 9, declared that (1) the smoker yielded a net return of $257.25 for the Korean fund; (2) he had possession of the fund; (3) he would deliver to the Post at its next meeting, January 23, 1951, $257.25; and (4) he spent the money upon himself. Witnesses also testified that the defendant did not attend the Post meeting on January 23, and did not upon that or any other occasion deliver to the Post any part of the sum earned by the smoker, notwithstanding demands made upon him.

One of the witnesses who gave the testimony which we just mentioned was Alton Williams, Post Commander. Mr. Williams testified that he, the defendant and several other members of the Post planned the smoker and that in so doing they agreed that out of its total receipts there should be deducted "only the expenses incurred on the night of the smoker." The balance, according to the agreement as related by Mr. Williams, would constitute the Korean fund and should

by paid by the defendant to the Post. January 18, when Thomas P. Holmes, another officer of the Post, and Roy L. Hebard, a member of the Post's house committee, were present, in addition to Williams, the defendant reported to them, so Williams swore, that the smoker had "cleared" $257.25, that the money was in a bank and that he would deliver it to the Post at its next meeting, January 23. The defendant concedes that he did not attend the meeting of January 23. One of the Post's officers located the defendant January 23 in a night club and sought to persuade him to come to the meeting, but the efforts were unavailing. Both Holmes and Hebard gave testimony substantially similar to Williams'. According to the Roseburg Chief of Police, the defendant told him and the local district attorney, in the latter's office on January 24, 1951, that he "had used $200 of this $257.25 known as the Korean fund on the previous day to post $200 bail on a gambling charge" and spent the balance on "different things" of a personal nature. The gambling charge mentioned by the Chief of Police was against the defendant and arose out of an escapade in which he engaged some days after the smoker. As a result of it the defendant was required to deposit $200 bail money and, later, upon a plea of guilty, was fined $100. He gave the remaining $100 to his wife.

It was in the manner just indicated that the state supported its charge that the defendant stole $257.25 of the moneys belonging to the Post.

As a witness, the defendant did not claim that he had not made the admissions aforementioned. He conceded that the state's witnesses related his declarations "generally" correctly. Referring to his statements to the Chief of Police, he said: "I don't know why I

told him that; I just told him.'' Likewise, he did not deny that the smoker yielded $257.25 for the Korean fund, except to claim that in making his computations he overlooked an expense item of $50 which he swore he paid some time after the smoker. If credit is given to the defendant for that alleged $50 disbursement, $207.25 remained in his hands. To show that he had not converted that money to his own purposes, he presented evidence which we shall presently review and which he claimed showed that he had disbursed the proceeds of the smoker upon operational expenses of the Lounge.

It will be recalled that, according to the state, the Korean fund was to consist of the total receipts of the smoker less only the expenses incurred on the night when it was held, January 9. Thus, no deductions were to be made for rent, heat, light, salaries or other expenses of the Lounge which were not incurred directly on account of the smoker.

Although the defendant did not so declare in unequivocal terms, nevertheless we believe that he conceded throughout the trial that the total receipts of the smoker, less the expense of conducting it, were to be delivered to the Post as the Korean fund. The brief which his counsel filed in this court states:

> "The net proceeds for the evening were apparently to be computed and a check drawn on the Veterans' Lounge account and turned over to the Post at some future date following the smoker.''

In the operation of the Lounge, the defendant had no authority to draw upon the Lounge's bank account, but was authorized to make payments out of the cash register. During the trial he claimed that he used the money earned by the smoker in the discharge of the expenses

of the Lounge, whether incurred for the smoker or for some other purpose.

As we have said, the charge against the defendant was that he embezzled $257.25 of money belonging to the Post, and have mentioned the fact that he conceded that the smoker produced $257.25. We shall presently quote from the defendant's testimony showing that, as a witness, he freely admitted that the smoker yielded $257.25. When he spoke of "the poker game" he meant a game which the Lounge conducted as a part of the smoker, and when he spoke of "my $90 that I had started with" he meant that before the smoker commenced there was $90 cash in the till. The following is taken from his testimony:

"Q At that time on January 18, 1951, you told Mr. Holmes that there had been netted from the smoker activity on January 9, 1951, the sum of $257.25, is that correct?

"A That is correct.

\* \* \* \* \*

"Q Now, in arriving at the figure of $257.25, how did you do that?

"A At the end of the, when the poker game broke up, I took the money and checks and took out my $90 that I had started with in the first place in the till and the rest of the cash that was in the till plus the money that we have taken in on the games and that was the total.

"Q And you took your expenses out of that?

"A Just what expenses do you mean?

"Q Weren't there any expenses for the night?

"A No.

"Q There was some film.

"A The film was paid on the 15th; that was never taken out of the $257.25.

"Q Are you telling the members of this jury, Mr. Monk, that the $257.25 represented the gross profit for that night?

"A Mr. Davis, that $257.25 represented the money made on the games plus the money in the cash registered [sic] that was taken in over the bar which was to be donated that night.

"Q Without regard to any expenditures?

"A The expenditures had been taken care of before on this ticket sale; * * *."

Thus the defendant indicated that the aforementioned sum of $257.25 was the gross income of the smoker. He did so notwithstanding the fact that our first opinion in this case, in referring to the smoker, said: "The net amount of $257.25 was realized as the result."

The gross return produced by the smoker was yielded, so far as we can determine, by the sale of admission tickets at the price of $1.00 per person, the sale of liquor by the drink, the profits resulting from a poker game which the Lounge operated that night, and, seemingly, by the serving of food. Concerning the item last mentioned, the defendant said: "I bought four turkeys, a ham, potato salad, everything for a smorgasbord." He also mentioned a waiter and some dining tables. No effort was made by anyone to reveal the total, or net, amount earned by any one of those activities, with the possible exception of the amount received from the sale of whisky by the drink over the bar. The defendant claimed that the sums received from the sale of drinks were recorded upon the tape of the bar's cash register, but the tape ran January 8, 9 and 10 together. It did not segregate any one of those three days. The defendant explained that "the cash register was not cleared" at the end of either January 8 or 9. Thus the entries for the three days, which totaled $210.60, were run together on the tape. The defendant believed, however, that through resort to symbols which appeared upon the tape and his knowl-

edge of average receipts he could approximate the amount received on January 9. He estimated it as $61.80. The latter, however, could not have been the total received from the sale of drinks because chips sold on the night of the smoker were accepted at the bar in payment of drinks and were not registered upon the cash register tape. When a customer paid for drinks with chips nothing was recorded upon the cash register tape, and likewise since the sums which were paid for chips were not placed in the cash register they were not entered upon that instrument's tape. To illustrate the significance of those statements, we shall resort to quotation of testimony. The defendant testified:

"Q Now, on the night of the smoker, Mr. Monk, quite a little bit of the money didn't come in through the cash register, isn't that right?

"A That is right.

"Q Most of it came in from the sale of chips, as I understand.

"A Yes.

"Q Your answer to that?

"A Yes."

William Holbrow, a witness for the defendant, who served as bartender the night of the smoker, testified:

"Q Tell me, if you can, the situation in regard to the sales of drinks on that particular night?

"A They were using cash and chips.

"Q At the bar?

"A Yes.

\* \* \* \* \*

"Q Now, you say that drinks were paid for both by cash and chips. Did you just throw the chips in the cash register too?

"A No. They were kept separate in a box; just the money went in the till."

The member of the Post who sold chips testified that "my booth was pretty busy that evening" and, in narrating his activities, he incidently mentioned that he received "numerous" checks in payment of chips, one of which was of the denomination of $20. It is apparent that the sale of drinks brought for the Korean fund more than $61.80. From the scant record which the defendant kept it is impossible to ascertain the total which the Lounge received from the sale of drinks.

No effort was made to show the cost of the liquor which the Lounge purchased for the smoker and, therefore, we have no means of determining the amount of the profit earned by the sale of drinks. In the Lounge's account book there is a column entitled "Taxes on Business Property. Licenses." The defendant swore that in that column he entered nothing about licenses or taxes, but the amounts of money which he spent in the purchase of whisky. He conceded that his transactions in whisky were unlawful. The liquor purchased January 8, 9 and 10 was lumped together in the column as $43.20. No one undertook to show how much of the total was chargeable against the smoker.

We have shown that it is impossible to determine from the record [except through the defendant's admissions] either the gross or the net amount which the smoker earned from the sale of liquor by the drink. No attempt was made to show how much was yielded for the fund by the take from the poker game. The individual who operated the game for the Lounge swore: "I merely kept the pot straight—raked the pots for the benefit of the house", and, hence, we assume that the game earned money for the fund. Although the defendant, in referring to the business done on the night of January 9, used the phrase "it was a good

night'' and others indicated that the attendance was sizeable, no one mentioned how much was received from the sale of admission tickets. The defendant testified, as we have seen, that he purchased for the smoker four turkeys, a ham, potato salad and other items, yet the record fails to reveal how much was earned for the fund as a result of those resources. A careful search through the record reveals only one notation showing an expenditure for food. It is a sales ticket, or bill, bearing the notations, ''3 turkeys roasted, $6.00'' and ''Pd.''

The record indicates that virtually everyone who served the Lounge during the night of the smoker donated his services. Even though it is impossible to determine from the data and figures the exact net amount earned by the smoker, it is clear that the amount was sizeable. The defendant, as we have seen, says that the gross income was $257.25. The only two expense items which the record reveals in terms of dollars and cents are (1) the cost of roasting the turkeys, $6.00, and (2) the rental cost of the film, $50. When those two sums are deducted from $257.25 there remains more than $200. The above is a review of all the evidence which indicates the income which came to the Lounge January 9 and the cost of conducting the night's enterprise.

We come now directly to Exhibits 26, 27, 28 and 29, being the statement which Mr. Young prepared. It will be recalled that when it was tendered, the state's objection to its admissibility was sustained. The Lounge account book, all statements of account produced by the defendant, all of the cash register tape and the bank's ledger sheet which we have mentioned were received in evidence. Further, the defendant was per-

mitted, while testifying, to use Mr. Young's statement to refresh his memory.

In arguing that error was committed when the challenged ruling was made, the defendant's brief presents the contentions which we shall presently quote. Before making the quotation, and in order to facilitate a grasp of it, we explain that the Lounge's account book was kept by one William Stock. The latter was dependent upon the defendant for information concerning all entries of receipts and disbursements which he made in the book. Following are the contentions:

"The state of the books was such that the jury could not compile the information. The records required some explanation which the witness got from defendant Monk prior to the compilation * * *. In view of the total inadequacy of the books to contain entries of many expenditures made for the Lounge by Monk, it does not appear that the accountant's summary containing other alleged expenditures by Monk should have been rejected by the court as self-serving declaration of Monk * * *. The record is replete with statements that all the contents of the books and other records were compiled from information solely given to William Stock by Monk in the first place and even though a few previously overlooked items of expenditures were given to Leo Young by Monk which were not contained in records kept by William Stock, they only served to complete the records and could no more be classed as self-serving declarations than any of the rest of the contents of the records. * * * The examination of the state of the books and records kept by William Stock clearly reveals that they were unskillfully kept and were not complete or brought up to date through the period of time during which defendant was accused of embezzling certain monies of the Veterans' Lounge and were in such condition that the records required some explanation which the accountant, Leo Young, got

from the defendant Frank Monk prior to the compilation of his summary."

The passage which we just quoted asserts that Stock's account book was "unskillfully kept". Stock made his entries in a book which the latter's publisher entitled "The Ideal System—Tavern and Cafe Bookkeeping and Tax Record". The flyleaf of the book says: "The Ideal System * * * requires no bookkeeping experience * * *." The book is divided into five sections. The first of the sections bears the title "Income" and the second "Expenses". The pages of those two sections are ruled into columns. Each of the columns has a heading suitable to the information to be entered in it. For example, one of the income columns is headed "Liquor Sales"; another, "Tobacco, Confections and Misc. Sales". One of the columns in the expense section is entitled "Rent"; another, "Food and Groceries"; still another "Liquor". There is no claim that Stock failed to make his entries in the proper columns or that any of them was inaccurate. We know of no justification for the statement that the book was "unskillfully kept".

It is conceded by the defendant that after the Lounge had discontinued his services on January 22 he met with Stock, upon the latter's request, and reported to him all income and disbursements which he had hitherto failed to do. At the same time he handed to Young, so he conceded, all statements of account pertaining to the Lounge which he possessed. The following is taken from his testimony:

"Q Now, Mr. Monk, after you severed your connections with the Veterans' Organization, after several requests, you turned over some of these documents to Mr. Stock, didn't you?

"A Yes.

"Q And without any records turned over by you, there was no way for Mr. Stock to compute the books?

"A That is right.

"Q And you turned over these articles after your termination on what date?

"A I couldn't give you the correct date; probably four or five days after that.

"Q And where did you have that meeting with him?

"A At Mr. Stock's house.

"Q And at that time you went over the books with him, didn't you?

"A Yes, we did.

"Q And at that time you were given credit in those books for every claimed expenditure you wanted, isn't that true?

"A That is right.

"Q Whether or not there was a written receipt or document to verify such an expenditure, isn't that right?

"A If Mr. Stock had questioned any of them he knew who they were and he could have gotten a receipt for them.

"Q My question was this, you were given credit for every claimed disbursement and expenditure?

"A Yes, I was.

"Q Whether they were backed up by a written document or not?

"A That is right.

"Q Who was responsible for getting the correct figures to Mr. Stock?

"A I was."

Notwithstanding the fact that Stock accepted the defendant's word and entered in the Lounge's book all the disbursements for which he claimed credit, the defendant now contends that he later thought of additional disbursements that he had made with Lounge

money and that Young's statement, in which he is given credit for the disbursements, must be consulted in order to gain an understanding of the total receipts and disbursements for the period January 9 through January 22, 1951. Thus his real claim in behalf of the admissibility of Young's statement is that it is complete and sets forth the true state of accounts. Let us now determine whether that claim, if granted, would authorize the introduction in evidence of Young's statement.

■ In a preceding paragraph we quoted § 2-212, OC LA, as amended by Oregon Laws 1949, Ch 75. It governs the admissibility of summaries made by auditors and other competent persons of numerous entries contained in record books and other writings. The principle which underlies § 2-212 is analyzed and set forth in Wigmore on Evidence, 3d ed, § 1230. See, also, 20 Am Jur, Evidence, § 449, p 398. It was employed in *Hubble v. Hubble,* 130 Or 177, 279 P 550; *Scott v. Astoria Railroad Co.,* 43 Or 26, 72 P 594; *Salem Traction Co. v. Anson,* 41 Or 562, 67 P 1015, 69 P 675; and *State v. Reinhart,* 26 Or 466, 38 P 822. By reverting to § 2-212, it will be seen that it says: "There shall be no evidence of the contents of a writing, other than the writing itself except" in the specific instances mentioned in that section of our laws. Thus the summary must concern "a writing". Accordingly, § 2-212 does not authorize the receipt in evidence of summaries of oral statements. As we have seen, Mr. Young's paper was not concerned exclusively with "a writing", such as the Lounge's account book, but, to the contrary, the part of it upon which the defendant principally depended consisted of a transcription by Young of oral statements made to him by the defendant in which the latter said that he had paid so much to this person and

so much to that one. His skill as an auditor enabled Young to couch his transcription of the oral communications in the form and phraseology of bookkeeping entries. We shall now give some examples taken from Young's statement. One of the entries in his statement is the following: "Extra waitress and bartender, $30.00." The explanatory matter which accompanies the statement gives this explanation of that entry:

"On Saturday nights extra help was usually required. It was customary to pay $5.00 for the waitress and $10.00 for the extra bartender. This item represents these payments for two Saturday nights. The names of those to whom paid are not available, nor are receipts available. The amounts paid were reported as paid out in the daily summary."

Another undocumented item which appears in Young's statement is the following: "Fredrickson's Photo Lab., film rental, $50.00". In the glossary appears this: "No receipt available. These films were of an illegal nature and no receipt for the rental fee was received. No record of the expenditure was made on the books." Still another of the items in Young's statement is this one: "Payment of back wages, $105.00." The appendix gives this explanation of the purported expenditure: "Payment of back wages to Mr. Holborow, a previous bartender. No receipt available." We shall mention one more of the items for which Mr. Young gave the defendant credit upon the defendant's word alone; it is the following: "Payroll advances, $226.00." The following is the elucidation which is given in the appendix:

"Wages were paid semi-monthly on the first and fifteenth of each month. It was customary for employees to be given cash draws between pay days. According to payroll records, the following

employees were given advances for the payroll period to January 15, 1951:

| Frank Monk | $125.00 |
| Royal Denton | 50.00 |

There appears to be no way to determine the dates of these draws. However, all except $40.00 of the draw by Frank Monk, and all the draw of Royal Denton was probably made during the latter part of the pay period and after January 9, 1951. Between January 15 and January 22 the following draws were paid:

| Frank Monk | $ 60.00 |
| Royal Denton | 31.00 |

No receipts are now available in support of any of these draws. They appear to be reconciled, however, to the amount of pay received by the individuals."

■ It is clear that Young's statement was not based exclusively upon "a writing". The part of it which would have served the defendant best was a transcription of oral communications succeeded by a compilation of the documented and undocumented data. It is our belief that Young's statement was not of the kind for which § 2-212 makes provision.

■ Still another part of § 2-212, OCLA, as amended, is the following:

"* * * When the originals consist of numerous accounts, or other documents, which cannot be examined in court without great loss of time".

As we have seen, the parts of the Lounge's account book material to this case were simple. No juror could have experienced difficulty in understanding them. The statements of account which the defendant delivered to Young and which became exhibits are twenty-three in number. They consisted in the main of such commonplace papers as sales slips and statements of

account. Every juror, who at the end of the month has checked and totaled a batch of household bills and supplemented them with a few items gathered from his memory, handled a task no more difficult than that which confronted this jury. We think it is obvious that § 2-212, in speaking of "numerous accounts" and the inability to examine them "without great loss of time", contemplates something more difficult than the simple pieces of paper which were placed before this jury. *Hubble v. Hubble,* supra.

Again reverting to § 2-212, OCLA, as amended by the 1949 enactment, we see that it says: "There shall be no evidence of the contents of a writing, other than the writing itself except" where the documentary evidence is extensive and "the evidence sought from them is only the general result of the whole". We do not understand that the state conceded that the defendant paid all of the purported accounts for which Young's compilation gave him credit. This is not an instance in which the "general result" alone was material. In this case, both the items and the "general result" were important.

For all of the reasons above stated, we believe that Mr. Young's statement was inadmissible and that the challenged ruling was free from error. But there is still another reason which convinces us that the statement was inadmissible. We now give it.

■ Young's statement charged the defendant with $90 "cash on hand at beginning of business January 9, 1951" but did not charge him with the stock of liquor, candy, tobacco, food and other items which were convertible into cash. If the defendant converted into money any of the resources just mentioned and thereby acquired $257.25, Young's statement could be correct and yet the defendant could be guilty. To possess evi-

dentiary value, Young's statement should have debited the defendant, not only with the $90 "cash on hand at beginning of business January 9, 1951", but also with all other resources which were the equivalent of cash.

We dismiss the first assignment of error as lacking in merit.

We shall now consider the second assignment of error which is based upon the ruling which denied the defendant's motion for a directed verdict. The nature of the contentions which the defendant offers in support of this assignment of error can be gathered from the following "Points and Authorities" which his brief submits:

"Admissions of defendant are not sufficient to convict even though inference of guilt may be strong unless the admissions are supported collaterally by a series of other facts from which guilt may be cumulatively inferred.
(State v. Porter, 32 Or. 135)
(State v. Weston, 102 Or. 103)
(State v. Fisher, 132 Or. 696)

"In the event the admissions were classed as a confession rather than as admissions, there must be some other proof that the crime has been committed.
(26-937 O.C.L.A.)

"There was no proof of other facts and circumstances other than an admission of defendant from which guilt could be inferred.
(State v. Monk, 193 Or. 450)"

In arguing in support of those propositions, the defendant uses only the testimony given by the state's witnesses. They related, it will be recalled, statements which the defendant made to them and which are summarized in preceding paragraphs of this opinion. It

may readily be that the statements which the defendant made to the District Attorney and the Roseburg Chief of Police were, in fact, confessions. We deem it unnecessary to determine their exact nature. When the defendant became a witness in his own behalf, he freely conceded, as we have seen, that the smoker yielded $257.25 and that all of that sum came into his hands. He also conceded that he delivered none of that money to the Post's officers. Duane Graves, who was a member of the Post's house committee and who, on the night of the smoker, operated the booth where chips were sold, as a witness for the defendant, gave the following testimony upon direct examination:

"Q What did you do with the proceeds of the evening when you left?
"A I left them with Mr. Monk.
"Q And when did Mr. Monk advise you, if he ever did, as to the net proceeds for that evening? Do you recall a definite amount?
"A I don't remember exactly when he did advise me but it seems as if it was a telephone conversation with me that he said they netted upwards of $200.00.
"Q Was that very shortly after the smoker?
"A Yes, sir."

From the above we see that one of the defendant's own witnesses related substantially the same statement made by the defendant as the state's witnesses had done. Upon cross-examination, Mr. Graves testified that since he was the active member of the house committee, the defendant "was accountable to me" and that that was the reason why he inquired of the defendant as to the amount which the smoker earned for the Korean fund. He added:

"I know I called him at a date, I can't say, the next day or day following that, and I asked him

had we made any financial gain and he said 'yes' that as near as he could figure it out, we had made upwards of $200.''

As nearly as he could recall, the conversation took place three days after the smoker. Shortly he gave the following additional testimony:

"Q Well, you turned that over to Mr. Monk and you have never contacted him since concerning it?

"A As I told you, I called him and asked if we had shown a profit and the answer he gave me.

"Q Well, then, just previously, your instructions to him were that he was to take the cash that came in, pay the expenses of that evening, and put the rest of it in the bank.

"A That was the instructions that Mr. Monk had.''

When the defendant testified, he referred in the following vein to the conversation with him that Mr. Graves had related:

"Q Now, did anyone ask you to account, anyone of the Veterans' Lounge or house committee ask you to account for this particular $257.25 at any time?

"A No, they didn't. I mean, I called Duane the following day, Wednesday, or he called me—I don't recall— and I told him what we had made at that time. No one asked for the money or anything like that.''

The following is also taken from the defendant's testimony:

"Well, as near as I can recall, it was in the evening and Frosty Holmes asked me how much money we had made and I told him the amount. And I also told him at that time that there would be a check at the following meeting, the 23rd; that I would have a check and the reason I had talked to

Duane about this was because he was the only active house committeeman at that time and we had decided just to show where the money had come from, we would deposit the money, write a check from the Lounge and give it to the Post on that particular evening.''

Lest it escape the recollection, it will be recalled that state witnesses swore that the defendant did not attend the meeting of the Post on the 23rd, that he did not deliver a check at that time for any part of the Korean fund, and that an officer of the Post located the defendant on the night of the 23rd in a night club and sought unavailingly to persuade him to come to the Post meeting.

The foregoing quotations were taken from the defendant's direct examination. The following is taken from his cross-examination:

"A  I said I had used $200 for bail. I didn't say it was the Korean fund; I said I had used $200 for bail.

"Q  Well, now, let's go back, Mr. Monk. At that time you were asked if you remembered the funds that were raised by the smoker for the Korean welfare, didn't you?

"A  That is right.

"Q  And you were asked if that wasn't the sum of $257.25, weren't you?

"A  Yes.

"Q  And you were asked what you did with that money, weren't you?

"A  Yes.

"Q  And your answer to that was that you had spent $200 of it for bail for yourself on a gambling charge.

"A  That is correct.

"Q  And you then were asked what happened to the rest of it?

"A  Yes.

"Q And your answer to that was you had spent that on yourself?

"A That is not true.

"Q What was your answer?

"A I said I had used it for miscellaneous items. At no time did I say I had used that money for myself.

"Q You just said you used it for miscellaneous items.

"A That is correct.

"Q That was on what date?

"A 24th.

* * * * *

"Q Did you ever go to the Veterans' Lounge and account for the money received in the Korean Fund?

"A No; I was arrested right after that.

"Q Now, you on January 18, 1951 had a conversation with Mr. Holmes, didn't you?

"A Correct.

"Q In the presence of Mr. Williams and Mr. Hebard.

"A I don't believe Mr. Hebard was there.

"Q All the gentlemen were up in the group?

"A I don't know if we were all in one group or not.

"Q At that time on January 18, 1951, you told Mr. Holmes that there had been netted from the smoker activity on January 9, 1951, the sum of $257.25, is that correct?

"A That is correct."

More declarations similar to the above could be quoted from the defendant's testimony, but the foregoing will suffice. It is clear that the defendant's conviction did not rest alone upon the statements which he made to Holmes, Williams and others who later became witnesses for the state. In testifying in his own behalf, he corroborated and confirmed the admissions

which they had attributed to him. If their testimony needed corroboration, he supplied it from its most acceptable source—his own lips.

■ The rules governing the admissibility of confessions had no application to the testimony which he introduced. It was not the state, but the defendant himself, who presented the testimony above quoted. The defendant does not claim that he committed any error in recounting the facts which he imparted, and does not ask to be relieved of a single syllable of his utterances. His testimony constituted judicial admissions. Wigmore on Evidence, 3d ed, §§ 2588 through 2590; 20 Am Jur, Evidence, § 557, p 469; but see Wigmore on Evidence, § 2594(a). The effect of the testimony which the defendant presented was to acknowledge that the smoker earned more than $200 for the Korean fund, that he had promised to deliver that sum to the Post at its meeting January 23, and that he failed to do so. His testimony also indicated that, in explanation of his failure to have paid the money to the Post, he told the District Attorney that he had used it for bail and miscellaneous purposes. During the trial he sought to acquit himself of guilt by repudiating his statement that he had used the fund for bail and by claiming that he had exhausted the fund in payment of purported accounts of the Lounge and in "payroll advances". The circumstances of his purported payments and advances, as described by the defendant himself, were such that the jury was not required to believe him. We shall give a couple of examples. He swore that he paid $157.50 to one Frances Condor, an entertainer, by issuing to her his personal check. Presently it developed that the check was not honored by the bank because of insufficiency of the defendant's deposit. Then the defendant claimed that a few days before the

trial he paid the account with cash. At the time of his purported payment he was neither an employee of the Lounge nor a member of the Post. He made no explanation as to his reason for making personal payment of an account of the Lounge when he was not personally indebted for the account. As evidence of another of his purported payments, the defendant produced a sales slip which was marked "paid", but it shortly developed that the statement was of recent origin and had been issued for evidentiary purposes.

■ In the opinion written in the defendant's case when it was here upon the original indictment, we said that "the admission made by defendant to the District Attorney that he had used a part of these funds as bail money was sufficient to carry the case to the jury." That statement is equally applicable in the present case. On account of it, and also on account of the additional facts above reviewed, we are satisfied that the trial judge committed no error when he denied the defendant's motion for a directed verdict. We dismiss this assignment of error as lacking in merit.

The third, being the last, assignment of error attacks the part of the instructions to the jury which defined the term "reasonable doubt". The defendant's counsel believes that the term defines itself and commends to us *People v. Klein*, 305 Ill 141, 137 NE 145, which holds:

"There is no more lucid definition of the term 'reasonable doubt' than the term itself."

Referring to the instructions which were given to the jury in the case at bar, defendant's brief suggests that they consisted of three definitions which the trial judge blended into one. It says:

"As the writer advised the Court, we cannot

> quarrel with each of the definitions given but we are convinced that taken as a whole the instruction is in formal language, and disconnected to the extent that the separate definitions given cannot help but confuse the jury as to the meaning of the term."

The instruction, with the exception of its last two sentences, was lifted virtually verbatim from *State v. Morey*, 25 Or 241, 35 P 655. The decision in that case repulsed an attack upon the instruction. The last two sentences of the instruction given in the instant case are:

> "A reasonable doubt is also defined as such a doubt as exists in the mind of a reasonable person after a full, free and careful examination and comparison of all the evidence in the case and is such a doubt as would cause a careful and prudent person to pause and consider before acting in the grave and important affairs of life. A reasonable doubt may arise from evidence or from lack of evidence."

■ *State v. Morey*, supra, after taking notice of the fact that some jurisdictions hold that the term "reasonable doubt" needs no definition, says:

> "* * * In this state, however, the practice prevails, in instructing juries in criminal cases, for the courts to attempt to define the term, and the familiar definition of Chief Justice Shaw in the celebrated Webster case is generally adopted."

We think that at this late day we should not reverse a judgment of conviction merely because the instructions given to the jury undertook to define the meaning of the term "reasonable doubt". The Morey decision, after it had referred in terms of esteem to the definition of reasonable doubt given in the Webster case, said:

> "* * * This definition, although it has been criticised as not being strictly accurate, is perhaps more generally recognized as a correct and concise

explanation of the term than any other to be found in the books, and, having been approved by this court (State v. Glass, 5 Or. 73; State v. Roberts, 15 Or. 196, 13 Pac. 896), trial courts should adopt it, rather than struggle for originality where precedent alone should govern.''

Although we adhere to the practical wisdom of Mr. Chief Justice BEAN, in the lines just quoted, we fail to find any error in the instruction which this assignment of error attacks. We do not think that the instruction was confusing or employed words beyond the ken of the ordinary juror. Possibly nothing was gained by way of clarity through incorporating into the attacked instruction all of its terms, but the trial judge saw the jury, heard the arguments which counsel had delivered to it and knew better than we do the enlightenment which it needed in the form of instructions. We are aware of no basis for believing that error was committed when the trial judge gave the attacked instruction. The third assignment of error is dismissed as lacking in merit.

The judgment of the circuit court it affirmed.